NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**LEAH K. BOLSTAD, OSB #052039**
Leah.Bolstad@usdoj.gov
**LEWIS S. BURKHART, OSB #082781**
Lewis.Burkhart@usdoj.gov
**SARAH BARR, WSB #40758**
Sarah.Barr@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:19-cr-00333-MC-04** |
| | **3:22-cr-00137-MC-02** |
| **v.** | |
| | **GOVERNMENT'S SENTENCING** |
| **LORENZO LARON JONES,** | **MEMORANDUM** |
| **Defendant.** | |

     As a member of the Hoover Criminal Gang (HCG) for over thirty years, Lorenzo Jones

engaged in numerous acts involving murder, robbery, and drug distribution. He engaged in this

racketeering activity in furtherance of the HCG criminal enterprise and his status in it. During his

brief periods out of custody, he has been caught committing, or conspiring to commit, at least ten

shootings. His actions have resulted in death and serious physical injury to multiple victims,

some of whom were not even his intended target. Through this conduct, he probably achieved his

goal of becoming an "O.G." within the HCG. But through the jury's verdict, the consequence for reaching this status is a mandatory life sentence with another ten years consecutive.

I.      **Factual Background – Nature of the Offense**

        A.      **The Racketeering Conspiracy**

The government presented evidence of a 30-year racketeering conspiracy involving the Hoovers in Oregon. In the early 1980s, the Hoovers established a presence in Oregon containing two main sets: Hoover 107 and Hoover 74. PSR ¶ 35. While the Hoovers were initially known as "Hoover Crips" the Hoovers across the United States separated themselves from the Crips, forming the Hoover Criminal Gang. PSR ¶ 34.

In Oregon, the Hoovers are built around the primary purpose of building and maintaining the perception they are most feared and violent gang. They reveled in calling themselves "everybody killers" or "EBK." Although the Hoovers have alliances with the Inglewood Family Bloods and the Unthank Park Hustlers, the Hoovers seek clout by shooting rival Crips and Blood gangs. PSR ¶¶ 35-36.

The Hoovers identify themselves by wearing the color orange and wearing professional sports teams attire that Hoovers appropriate to represent their gang. For example, the Hoovers often wear and use Houston Astros insignias as the Astros utilize an orange letter "H" that Hoovers claim stands for Hoover instead of Houston. Hoovers also identify themselves by using symbols standing for Hoover and the two sets in Oregon.

The Hoovers have a loose hierarchal system where members gain power and influence through age/seniority and the amount of illegal activity or "work" the member performs. PSR ¶ 37. Older members with the highest status are referred to as Original Gangsters ("OGs") and also "shot callers." *Id.* These individuals have the authority to order younger members to commit

violent acts. In order to gain membership, Hoovers use an initiation process known as "jumping in" whereby Hoover members physically beat new recruits for 74 or 107 seconds, depending on the Hoover set the new recruit was invited to join. *Id.*

Senior members, also called "big homies" adopt younger members, also called "little homies," to mentor them and use them to conduct business and violence on behalf of the gang. PSR ¶ 38. Senior members pass down versions of their moniker to junior members of the enterprise, sometimes creating multi-generational lineages. The amount of "work" younger Hoovers put in directly reflects upon their "big homie."

Though seeking to kill rivals is the central tenet of the Hoovers, the Hoovers and allies made money through illegal methods such as robberies, drug dealing and sex trafficking. PSR ¶ 39. Most Hoover members do not work legitimate jobs, unless ordered as a condition of probation. To fund their violent gang, they turn to illegitimate ways to make money.

B.     **Jones' Role in the Racketeering Conspiracy**

The jury heard numerous racketeering acts committed by the Hoovers. PSR ¶¶41-241. Although a defendant may be convicted of a RICO Conspiracy without personally committing a racketeering act[1], this memo will focus on Jones' actions.

1.     1989 Attempted Murder of A.M.

In 1989, Jones committed a drive by shooting in Portland. Police questioned Jones and he admitted he fired six rounds in a drive-by shooting. PSR ¶¶ 47-48. Jones admitted he was a "Hoover 74 Crip," and told officers he knew that the residence was a hangout for "Blood" gang

---

[1] "If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts." *United States v. Abbell*, 271 F.3d 1286, 1299 (11th Cir. 2001), *cert. denied*, 537 U.S. 813 (2002).

members. PSR ¶ 49. He admitted to obtaining the firearm, loading it, and shooting at the subjects on the porch. He told police he was trying to "*hit a slob*." Slob is derogatory term for a Blood gang member. *Id.* Jones explained, "*I was trying to kill a slob, I didn't want to miss*." *Id.* Police seized a .22 caliber pistol under the seat of the vehicle where Jones was contacted. *Id.* Jones admitted the gun was his and it was the firearm used to commit to the shooting. *Id.*

2.    <u>1993 – Attempted Murders</u>

In December 1993, Jones participated in two shootings in Eugene. PSR ¶ 51. One targeted occupants of a trailer home and the other was between two vehicles. *Id.* Witnesses reported a group of Crips had come to Eugene from Portland, and these shootings occurred after a dispute with one of the intended targets. *Id.* Jones was charged with state crimes including Unlawful Use of a Weapon. He went to trial in one case, was found guilty, and then pled guilty in the other case. He was sentenced to consecutive terms of 22 and 24 months' imprisonment. PSR ¶ 52.

During his plea colloquy, Jones admitted, "Well, December 19, I came from Portland to Eugene with some friends, and we had a confrontation with some people at a party on Bartelson Road somewhere, and I had a nine millimeter that I used to open fire into the trailer." Govt. Ex. 40. During his sentencing hearing, defendant explained himself as follows:

> I lost my father in '89, which I was 14 years old, and that was when I chose to join a gang. I assumed, you know – not assumed, but I took part, as the leader of our gang as my father, and my other homies in my gang brothers and older brothers. And between that time I tried to stop the gang two different times, not – stop banging completely, confronting my home boys and tell them no.
> I tried to tell them. There is a code which you join a gang; you never tell on your home boys, and you are in it for life, until death takes you away. I took that and accepted that and I think it was the hurt of losing my father that chose me to be that aggressive and that deep into the gang. Which is

really – it is really hard to explain, because if you are not involved in it,
you know, you couldn't – you would not be able to understand the hate.
The anger that binds the group together. It knows that there is love there. It
is a negative love. Nobody is going to hurt me, and I will die before I let
somebody hurt you. PSR ¶ 54.

3.     1998 Conspiracy to Murder "Lil Spyder"

In 1998, Jones was shot in the leg, but he did not cooperate with law enforcement.

PSR ¶ 56. A short time later, Jones found out that Lil Spyder was having a party and

gathered several Hoovers to seek retaliation. *Id.* Jones, CD4 and K.A. participated in

obtaining firearms and surrounding Lil Spyder's house. PSR ¶¶ 56-57. Jones and the

Hoovers aborted their plan when a police car drove by. PSR ¶ 57.

4.     1998 Garcia Murder

In 1998, Hoover members CD4, Robert Rean and Jones got into a large fight with

Hispanic residents of the El Moro Apartments. PSR ¶¶ 59-60. During the fight, CD4 was struck

in the face with a bottle and suffered a blow-out orbital fracture that required reconstructive

surgery. PSR ¶ 59.

Later that night, one of the Hispanic individuals involved in the fight, Ausencio Garcia,

was shot and killed at the same apartment complex. PSR ¶ 58. Police recovered 14 9mm shell

casings all clustered around one alleyway into the complex and testing determined they were all

fired from the same gun. *Id.* Jones returned to the scene of the shooting and agreed to be

interviewed by detectives. PSR ¶ 60. Jones admitted to being part of the fight where CD4 was

injured and requested the help of K.A., another Hoover member. *Id.*

In 2003, as part of a plea deal, K.A. confessed to his role in the crime. PSR ¶ 61. K.A.

pled guilty to conspiring with Jones to murder Garcia. K.A. was not present during the fight

when CD4 was struck by a bottle. *Id.* K.A. said he received a call from Jones, aka "Low Down," who wanted his help. Jones said that the group they were fighting "busted" [CD4] and there was blood all over Jones' car. PSR ¶ 62. K.A. drove his car to the apartment complex where the fight had occurred and joined him in CD4's apartment. Jones made everyone leave the apartment. *Id.* K.A. and Jones drove around the apartment to the side and parked. Jones exited the car with a chrome, 9mm semiautomatic gun with a gold trigger and said "*I'll be right back*." *Id.* K.A. stayed in the car. He heard multiple gunshots and saw the light flashes of the gun fire. *Id.*

When Jones returned to the car he yelled "*I got him. I got him. He fell down*." PSR ¶ 63. Jones repeatedly said, "*I dropped him. I killed dude. I killed him*." *Id.* Jones told K.A. later that he went back to the apartments to talk to the police the morning after the murder. In conversations with CD4 after this murder, Jones reassured him that he took care of that problem with "the Mexicans." While in pretrial custody in this case, Jones was housed next to CD6. The two discussed their cases and Jones bragged about killing a Hispanic male in 1998 by shooting him in the head with a silver 9mm handgun. Jones was angry K.A. provided information to law enforcement and claimed K.A. was not accurate about some of the details.

Jones was found not guilty of substantive counts charging him with the murder of Ausencio Garcia. PSR ¶ 64.

5.    <u>1998 Drug Distribution</u>

In October 1998, officers saw Jones engage in what appeared to be a hand-to-hand drug transaction. PSR ¶ 221. Officers located rock cocaine in Jones' vehicle's front seat and a business card which stated, "God Forgives! But Hoovas Don't." *Id.* Jones was convicted of Unlawful Delivery of a Controlled Substance in 1999.

6. <u>2005 Felon in Possession</u>

In 2005, Jones was involved in a large shootout in downtown Portland where Jones' friend and Hoover ally, Adrian Bible was murdered. Jones was pulled over fleeing from the scene in a van that contained several firearms. Jones went to trial and was convicted of Felon in Possession of a Firearm. Judge Mosman initially sentenced Jones to 262 months imprisonment. Jones' sentence was later reduced to credit for time served due to *Johnson v. United States*, 576 U.S. 591 (2015). Judge Mosman called the shootout "one of the worst shootouts in Portland history." Ex. 1, 92.

Jones' assertations that he was only convicted of constructive possession are in stark contrast with Judge Mosman's comments at sentencing. Judge Mosman said, "This does not mean, however, that the defendant comes off looking like an innocent bystander that night. Clearly, despite what [Jones] told me today, he went to a place where he was likely to encounter his sworn mortal enemies, dressed for provocation." *Id.* at 91. Judge Mosman continued, "The man that shot Adrian Bible, that's you. You're that kind of man. Just bad luck for you, bad shootings perhaps, makes you something other than a man who has shot his gang enemies for no good reason...you've been that same sort of young man willing to shoot over nothing." *Id.* at 93.

7. <u>2016 Wild West Marijuana Robbery</u>

In October 2016, a Wild West security guard was on routine patrol when he came across individuals inside the marijuana grow. PSR ¶ 202. The security guard heard gunshots and he ran away not seeing who shot at him. *Id.* Eugene police officers responded to the scene locating six shell casings and an abandoned cellular phone. PSR ¶ 203. A subsequent search of the phone revealed it belonged to Hoover member Damian Knighten. *Id.*

CD1 and CD6 testified they participated with theft of a marijuana dispensary in Eugene with Jones sometime during the fall of 2016. PSR ¶ 205. CD1 and CD6 both learned from other Hoovers, that Jones, Knighten and other Hoovers returned to the same marijuana grow again. PSR ¶¶ 207, 211. During the second theft at Wild West, Jones came across a security guard and shot at him. PSR ¶¶ 207, 211.

        8.      <u>2017 Conspiracy to Murder E.H. Jr.</u>

In May 2017, multiple gunmen broke into an occupied apartment in Gresham and shot at the family inside. PSR ¶ 149. They struck 9-year-old L.H. in the head, neck and abdomen. *Id.* He suffered significant brain and eye damage. The bullets also struck L.H.'s mother C.T. as she tried to shield him from harm in her bedroom. *Id.* She even yelled at the shooters to stop because there were "babies in the room." *Id.* Indeed, her 2-year-old child K.H. was also in the room, being protected by her father E.H. Jr. *Id.*

E.H. Jr. is a member of the Woodlawn Park Bloods, a Hoover rival gang with whom they had an ongoing feud. PSR ¶ 150. A significant event in this feud was the August 2014 murder of Ervaeua Herring, the sister of E.H. Jr. and daughter of known Woodlawn Park Blood leader and shot caller E.H. Sr. *Id.*

Investigators identified three active suspects – Chris Jordan, Nakiem Brown, and Rashad Banks – each of whom were Hoover members. PSR ¶ 151. Phone analysis revealed significant and unusual contacts between these three suspects in the hours leading up to the 4:30 a.m. shooting. *Id.* Brown and Banks also had contact with two Hoover O.G.s in this same time period – Lorenzo Jones and Corey Hudson. *Id.* Cell phone analysis showed that in the minutes and hours after Hoover member Ronnie Smith was shot and hit in Portland (2130 hours), both Hudson and Jones shared communication events with each other and with Nakiem Brown and

Rashad Banks. PSR ¶ 152. Additionally, phones used by Hudson and Jones moved north on I-5 from Eugene (Jones) and Salem (Hudson) together or in tandem. *Id.* Once they arrived in Portland, just hours before this retaliatory shooting on a rival, phones used by Jones and Hudson hit off cell towers in the same coverage areas used by Brown's and Banks' phones at the same time. *Id.*

Chris Jordan, Nakiem Brown and Rashad Banks were prosecuted in state court for Attempted Murder and Conspiracy to Commit Murder. PSR ¶ 153. A Multnomah County judge found Banks guilty on four counts of Attempted Murder. *Id.* The judge found Brown guilty of Felon in Possession of a Firearm but acquitted him on the attempted murder charges. *Id.* The judge acquitted Chris Jordan on all counts. *Id.*

CD1 testified that Nakiem Brown told him that Jones gave them the guns and that Jones said E.H. Jr. "needed to get handled." PSR ¶ 154. CD2 testified that Nakiem Brown told CD2 that Jones did not enter the residence that evening, but Jones and Hudson called him several times until Jones and Hudson showed up at Brown's doorstep. PSR ¶ 155.

While in custody on this RICO case and housed with CD6, Jones acknowledged to CD6 participating in the lead-up to this shooting. He acknowledged the evidence puts his cell phone in the area. Jones was angry that one of the state suspects implicated him (Jones) in the crime, and he was mad one suspect left behind some blood on a fence. PSR ¶ 156. He never denied being involved, nor did he distance himself from the Hoovers who did the shooting. Instead, Jones smiled about this event and said, "*Fuck that bitch. Fuck that kid.*" PSR ¶ 157.

9.    2017 Butler Murder

In September 2017, Wilbert "Billy" Butler was murdered after exiting the Kateri Park Apartments in SE Portland. PSR ¶ 158. A female hosted a small party that included several Crip

gang members and one rival Inglewood Family Blood, Joel "Jo Jo" McCool. During the party, a physical fight broke out between McCool and the Crips at the party. *Id.*

Apartment video surveillance caught McCool leaving the apartment complex at 12:50 a.m., shirtless, missing a bracelet and holding his cell phone. PSR ¶ 159. Immediately after leaving the apartment complex, McCool called a more senior Inglewood Blood, Aronte Kerney Sr., several times. *Id.* After connecting, Kerney called defendant Jones who then called McCool at 12:56 a.m. PSR ¶ 160. These calls set in motion McCool and defendant Jones seeking violent retribution against the rival Crips for the fight. PSR ¶ 159. Unbeknownst to McCool and defendant Jones, the Crips involved in the fight had already left the apartment complex only two minutes after McCool left. *Id.*

Cell site information placed McCool in the area of the Kateri Park Apartment Complex and defendant Jones in the area of 82nd Ave. and SE Holgate around 12:56 a.m. PSR ¶ 160. A PPB license plate reader happened to capture defendant Jones' silver Chrysler 300 at 12:47 a.m. parked at SE Raymond Court, near 82nd Ave. and SE Holgate. Cell site information showed McCool and defendant Jones moving towards each other until 1:11 a.m. when both phones hit off the same cellphone tower. *Id.*

At 1:30 a.m., McCool and defendant Jones appeared on the exterior video surveillance at the Kateri Park Apartments. PSR ¶ 160. Defendant Jones wore distinctive clothing: black Adidas pants with reflective vertical stripes and a white t-shirt with a white reflective tiger. *Id.* At 1:32 a.m., McCool and defendant Jones moved to the interior courtyard, directly below the apartment hosting the party. *Id.* At 1:35 a.m., McCool and Jones walked toward the north exit of the Apartment Complex. At approximately, 1:41 a.m., Butler and four other individuals got off the elevator and departed through the north exit of the apartment complex. PSR ¶ 162. About eight

seconds later, interior surveillance shows a bullet strike the exterior door. *Id.* The apartment complex did not have any surveillance cameras in positions to capture the shooting, nor the positions of the shooters or victims. *Id.* The exterior video surveillance does catch McCool and defendant Jones running south on SE 28th Avenue while carrying items that are the size and shape of firearms. *Id.*

PPB responded and Officer Bailey accompanied victim Butler on the way to the hospital in an ambulance. PSR ¶ 163. Officer Bailey thought Butler said his "Cousin John John" shot him with a silver handgun, but acknowledged while testifying Butler could have said "Cousin Jo Jo." *Id.* Butler's family was later interviewed and stated they do not have a "Cousin John John." *Id.* They said they only have a cousin named Joel "Jo Jo" McCool. *Id.* Butler was pronounced dead at the hospital. PSR ¶ 165. An autopsy found Butler was shot eight separate times and died of gunshot wounds. *Id.* However, the Medical Examiner could not determine if he was struck with 9mm and/or .40 caliber bullets. PSR ¶ 165. McCool and defendant Jones mistakenly believed Butler was one of the Crips who had disrespected McCool and then they murdered the wrong person while seeking retribution. PSR ¶ 166.

PPB personnel located 13 9mm shell casings in the general area to the north of the exit and 12 .40 caliber shell casings to the east of the north exit. PSR ¶ 164. Numerous individuals called 911 to report the shooting. PSR ¶ 167. One neighbor saw a person matching Jones' description firing at people leaving the apartment complex in the area where the .40 caliber casings were located. *Id.* A separate 911 caller saw two shooters, one wearing a white t-shirt and black pants and another shooter wearing red pants and no shirt running away. *Id.* The two shooters ran south on 28th Avenue and left in a car similar to a Chrysler 300. *Id.*

Cell site information shows that at 1:50 a.m. both McCool and defendant Jones' phones hit off cell towers near 82nd Avenue and SE Holgate. PSR ¶ 168. At 3:02 a.m., defendant Jones' phone began to hit off cell towers near one of his girlfriend's house located on SE Lydia Court. *Id.* On February 3, 2018, PPB executed a search warrant at this Lydia Court residence and seized a Glock .40 caliber pistol, model 22, with an extended magazine. PSR ¶ 171. Forensic toolmark testing later concluded the .40 caliber casings seized at the Butler crime scene in September 2017 were fired from this Glock .40 caliber pistol. PSR ¶ 171. DNA analysis on this firearm found a mixture of three contributors, and defendant Jones could not be excluded as one of these contributors, with a likelihood of 1.63 x 10$^{15}$ (1.63 quadrillion times). *Id.*

At approximately 2:15 p.m. on September 17, 2018, defendant Jones' phone started traveling south to Eugene and ultimately arrived at Aronte Kerney Sr.'s residence on Brockton Place. PSR ¶ 168. On February 3, 2018, PPB executed a search warrant at the Brockton Place residence locating several items tying Jones to the residence, including mail and his driver's license. PSR ¶ 170. Officers also seized the shirt and pants matching distinctive clothes that Jones wore on the night of Butler's murder. *Id.*

CD5 told investigators Jones expressed to CD5 that he was the "*King of Portland*" and Jones was angry that younger gang allies and rivals did not know his violent reputation. PSR ¶ 172. Jones told CD5 he was going to "*remind people*" of his violence and reestablish his dominance. *Id.*

Jones admitted to CD6 about his involvement in the Butler murder. PSR ¶ 173. Particularly, Jones told CD6 that he brought guns to help McCool shoot some rival Crips in response for being jumped. *Id.* Jones told CD6 about legal defenses his team will make at trial, including claiming Jones possessed an eyeglasses case captured in the video surveillance and not

a firearm. PSR ¶ 174. Defendant Jones admitted to CD6 that he had the firearm and was trying to kill some rival Crips. *Id*.

Jones presented a variety of defenses at trial to his involvement in the Butler murder. Jones was not there. If Jones was there, he did not have a gun. If Jones was there and had a gun, that he was only firing in self-defense. The jury rejected those claims and found Jones guilty.

10.     2017 Attempted Murder of D.H.

On November 18, 2017, Defendant Jones was shot in downtown Portland at NW 4th Avenue and NW Couch. PSR ¶ 175. He was a passenger in a convertible Mercedes being driven by a girlfriend. *Id.* The car parked near NW 4th Avenue and NW Couch, near a group of rival gang members. *Id.* Defendant Jones later told cooperating defendants that he saw D.H. in the group of rival gang members. *Id.* Rival gang member Alejandro Vance then crossed the street and fired numerous shots and struck Jones several times in the back and ear. *Id.* Officers arrested Vance on scene, located the firearm he used, and Vance was subsequently convicted of the shooting in Multnomah County Circuit Court. *Id.*

Jones' girlfriend drove him to the hospital where he refused to cooperate with law enforcement. PSR ¶ 176. Officers took photos of Jones' clothing, including a Hoover-related hat and a shirt with the lettering "O.G" for "Original Gangster." *Id.*

Jones held D.H. responsible for the shooting because he believed D.H. directed Vance to shoot him. PSR ¶ 182. During the night of December 1, 2017, D.H. was out in Eugene with his girlfriend. PSR ¶ 180. While out, D.H. saw Jones and immediately left the establishment, purchased some food and returned to the Bailey Apartments in Eugene. *Id.* The Bailey Apartment complex video surveillance captured Jones appear in the parking lot around 1:50 a.m. at which point he hid behind a wall and waited. PSR ¶ 181. At approximately 1:59 a.m., D.H.

walked across the parking lot and Defendant Jones appeared from hiding and fired thirteen shots at D.H. PSR ¶ 177. D.H. was struck five times and was transported to the hospital. *Id.* D.H. survived, but was not cooperative with law enforcement. *Id.*

Cell tower information placed Jones in the area of the Bailey Apartments from 1:53 a.m. until 2:25 a.m. PSR ¶ 178. During PPB's search of the Brockton Place residence on February 3, 2018, officers seized a 9mm Glock 19 pistol. *Id.* Subsequent forensic toolmark analysis concluded that the shell casings seized from the Bailey Apartments December 2, 2017, were fired from this 9mm Glock 19 pistol. *Id.*

CD6 spoke to Jones about the attempted murder of D.H. PSR ¶ 182. Jones held D.H. accountable for Vance shooting him and wanted retribution. *Id.* Jones' associate saw D.H. enter a bar and then sought out D.H. *Id.* Jones waited at D.H.'s apartment complex until D.H. appeared and shot him numerous times. *Id.* 183.

           11.     <u>2017 Attempted Murder of J.C.</u>

In December 2017, Portland Police responded to an early morning shooting at SW Stark Street and SW 3rd Avenue in downtown Portland. PSR ¶ 184. Surveillance video footage of the incident shows several vehicles including a vehicle driven by a Hoover member Ronnie Smith, enter a parking lot and park. *Id.* The occupants, believed to be Hoovers, are seen talking with each other. Soon thereafter, a white Mercedes sedan, occupied by J.C., a Woodlawn Park Blood, is seen driving into the same parking lot. As the Mercedes drives in, Ronnie Smith approaches the Mercedes occupied by J.C. PSR ¶ 185. As Smith neared the driver's side door, J.C. fired multiple rounds from his driver's seat position and struck Smith in the stomach. *Id.* The video shows another suspect, later identified as Lorenzo Jones, firing about 30 rounds at J.C. as J.C. is

attempting to drive away from the scene. *Id.* Jones is then seen fleeing the scene in a silver Chrysler 300 sedan. *Id.*

Police collected 31 9mm shell casings from the scene and submitted them to the Oregon State Crime Lab for analysis. PSR ¶ 186. The 9mm shell casings were compared to the 9mm Glock semi-automatic handgun seized from the Brockton Place residence in Eugene, Oregon. A forensic scientist conducted toolmark analysis and concluded the 31 spent 9mm casings collected at the J.C. shooting scene were fired by the 9mm Glock seized at Brockton Place. PSR ¶ 186. This was also the same gun Jones used to shoot D.H. on December 2, 2017. *Id.*

      12.    <u>2016 to 2017 Distribution of Controlled Substances</u>

Upon being released from the Bureau of Prisons, Jones started to work with CD5. PSR ¶ 232. Jones immediately began to sell heroin and cocaine. *Id.* CD5 allowed Jones to utilize CD5's residence to break down larger quantities of drugs into smaller baggies while Jones lived at a halfway house. *Id.* Ultimately, CD5 began to source cocaine from Jones. *Id.* CD5 estimated he purchased one to three ounces of cocaine every week for four to five months. *Id.*

After Jones was shot by Alejandro Vance, officers saw a large amount of unexplained U.S. currency in Jones' possession. PSR ¶ 236. When he was arrested in January 2018, Jones had another large amount of unexplained U.S. currency. *Id.* During the February 2018 search at Brockton Place, officers seized a large amount of cocaine from a room that investigators believe Jones used. *Id.*

## II.    Guidelines

### A.    Contested Guidelines

There are two defense objections to the PSR's guideline calculation – the leadership enhancement and career offender. Neither issue impacts the total offense level of 43. PSR ¶¶

259-260 (because there is a TOL 43 and advisory range of life on Counts 1 and 4, "the guideline calculations applicable to the other counts of conviction and underlying offenses in this case have no effect on the advisory guideline sentence of life."). Nevertheless, the government will address those topics here.

    1.    <u>Leadership (USSG § 3B1.1)</u>

A 2-level leadership enhancement is appropriate under Section 3B1.1. PSR ¶ 265. Multiple witnesses described Jones as a "big homie" who played a leadership role in the gang; he led by example. Tr. 9-14-22 (CD1) at 127 (describing Jones as a "big homie"). K.A. testified that in the Hoover gang hierarchy in the late 1990s, he (K.A.) was below Lorenzo Jones, so when Jones told him to stay where he was in the 1998 Garcia homicide, he had no choice in the matter. Tr. 9-8-22 (K.A.) at 208-209. CD4 testified that in the late 1990s, Jones had a "pretty good status" in the gang and he "had a lot of influence over a lot of the younger guys." Tr. 9-15-22 (CD4) at 92. Defendant is the one who "called meetings." *Id*. at 75. CD4 described K.A. as being someone who was "under" Lorenzo Jones. *Id*. at 95.

Once defendant got out of custody in 2016, he bragged about being a senior Hoover member, albeit one whose standing had suffered by being away for so long. Tr. 10-5-22 (CD5) at 86-87; PSR ¶ 240. Jones indicated to CD5, "it didn't seem like he had the same standing, like people would have forgot about him, and so he was trying to reestablish that reputation." *Id.* Jones told CD5 that he (Jones) was a "shot caller" in Hoover, meaning the "boss" and "pretty much the one in charge." *Id*. at 86; PSR ¶ 240. If there were any question about Jones' heightened status amongst the Hoover, he wore a shirt that said "O.G." when he was shot by Alejandro Vance. PSR ¶ 176.

CD3, an active HCG member in 2015-2016, described Lorenzo Jones as "one of the biggest" higher-ups in Hoover 74. Grand Jury Tr. 3-17-22 (CD3) at 22. Defendant was "in charge" of other Hoovers during the 2016 HCG robbery at Wild West Marijuana Dispensary. Tr. 9-14-22 (CD1) at 153-154; PSR ¶ 205.

Finally, defendant played a leadership role in the May 2017 shooting in Gresham. PSR ¶ 241. Shooter N.B. told HCG member CD1 that defendant gave him the guns, told him the intended target "Little Foxxy" was cooperating with police, and that this conduct "needed to get handled." Tr. 9-14-22 (CD1) at 171-172. Defendant and Corey Hudson were involved in the planning before the shooting took place. Tr. 9-7-22 (CD2) at 67. Both men had been calling N.B., but he didn't answer, and then both men came to his door and picked him up. *Id*. at 64-67. Phone records corroborate these witness statements. PSR ¶ 241; Govt. Exhs. 148 and 149.

### 2. Career Offender (USSG § 4B1.1)

Defendant contends he is not a career offender because the qualifying predicates are beyond the 15-year scoring period from the 2017 Butler homicide. The government agrees with Probation, who finds he is a career offender. Technically, defendant qualifies as a career offender, but this is an unusual case. Normally, the 15-year scoring rule operates to exclude any prior conviction that occurred more than 15 years before the instant offense. However, for purposes of career offender, USSG § 4B1.2(c) defines "two prior felony convictions" as those that score points under USSG § 4A1.1(a), (b) or (c). Here, because we have relevant conduct spanning the 30-year RICO conspiracy, defendant's aged priors score points in the PSR. *See* ¶ 275 (1991 Assault II, 3 pts), ¶ 276 (1994 UUW, 3 pts), ¶ 277 (1994 UUW, 3 pts), ¶278 (1998 DCS, 2 pts).

More importantly, the career offender designation matters not at all for the guideline calculation in this case, as captured in the PSR ¶¶ 258, 268-269. "The guideline range determined by USSG § 4B1.2(c)(3) in this case would be 360 months to life. The guideline sentence determined by the non-924(c) counts in this case is life. Therefore, the career offender determination has no impact on advisory guideline calculations." PSR ¶ 268. Defendant scores 21 criminal history points, so he reaches a CHC VI regardless of his career offender status.

**B.      Guideline Computation**

There is no plea agreement. Defendant was convicted by a jury of RICO Conspiracy (Count 1), VICAR Murder (Count 4), Using a Firearm During a Crime of Violence (Count 5). The statutory mandatory minimum sentence for Count 4 is life imprisonment. PSR ¶ 260. The government agrees with the PSR's guideline calculations. Counts 1 and 4 are grouped. PSR ¶ 256. Defendant starts at a BOL 43. PSR ¶ 260. For all the reasons summarized in PSR ¶¶ 237-241, and above, a 2-level increase applies for leadership. PSR ¶ 265. Defendant did not earn any reduction for acceptance of responsibility. PSR ¶ 245. His adjusted offense level is 45, but in the rare case where the guidelines produce a total offense level above 43, it is to be treated as an offense level of 43. PSR ¶ 258.

**C.      Victim Impact Statement**

The government has been in contact with Billy Butler's sister as a representative of the Butler family. Butler's sister initially expressed that either she or her family may wish to address the court at sentence. At the time of filing, however, the Government does not believe any of the Butler family wishes to make a statement.

**D.     Restitution & Forfeiture**

1.     <u>Restitution</u>

The government has made restitution inquiries to the family of homicide victim Wilbert Butler (Count 4). As of the date of this filing, we have not received a restitution request. The government requests an additional 30 days post-sentencing to resolve the matter. If a request is received, the government will work with defense to seek agreement on a restitution figure.

2.     <u>Forfeiture</u>

By virtue of the guilty verdict, and pursuant to 18 U.S.C. §§ 1963, 924(d); and 28 U.S.C. § 2461(c), the government seeks forfeiture of the following items:

- One Glock .40 caliber handgun;
- One Kel-Tec 9mm Luger handgun;
- One Luger Glock 9mm semiautomatic handgun; and
- All associated ammunition and accessories.

**III.     Jones' Supervised Release Violation – 3:07-cr-00168**

The Government concurs with the probation's recommendation of revoking Jones' supervision and sentencing Jones to 24 months incarceration to run concurrent to the sentences in 3:19-cr-00333 and 3:22-cr-00137 and no reimposed supervision.

**IV.     Government's Recommended Sentence**

Given the horrific nature of this crime, along with defendant's extensive and violent history, the government recommends a life sentence on the VICAR murder with a consecutive ten years on the 18 U.S.C. § 924(c). Such a sentence is required by statute, it is the advisory sentence under the guidelines, and it is reasonable in light of the Section 3553(a) factors, as described below.

### A. Ten-Year Consecutive Sentence

Defendant was convicted of 18 U.S.C. § 924(c) in Count 5 and the Court is required to impose a ten-year consecutive sentence, even if academic with a life sentence. The Court is prohibited from imposing any imprisonment under 18 U.S.C. § 924(c)(1)(D)(ii) concurrently. The Supreme Court affirmed a consecutive sentence to any other imprisonment as required under the statute. *United States v. Gonzales*, 520 U.S. 1, 11 (1997). 18 U.S.C. 924(c), "forbids a federal district court to direct that a term of imprisonment under that statute run concurrently with any term of imprisonment, whether state or federal." *Id.*

### B. The Nature and Circumstances of the Offense

As described above (Factual Background), and quite thoroughly in the 342-paragraph PSR, the seriousness of defendant's crimes cannot be overstated. He is a career criminal who, as an HCG member, engaged in violence every time he is out of custody. He hurt many victims with his involvement in numerous shootings. He murdered a young man who had done nothing wrong. A family lost a son and brother. And even after this murder, defendant continued his violent course of conduct trying to regain his stature and become an "O.G." with each pull of the trigger. These are incredibly serious offenses that warrant a very high sentence.

### C. The History and Characteristics of the Defendant

Jones' criminal history score is a Criminal History Category VI, but scores an astounding 21 points. In 2008, Jones admitted during his last federal sentencing, "I have a very severe, threatening, dangerous, violent criminal history." Ex. 1, p. 70. Jones' criminal history literally scores off the Sentencing Table's chart. His criminal history is so high that if it was split between two defendants, he would still be a Criminal History Category VI and a Criminal History

Category IV. During the same 2008 sentencing, Judge Mosman described Jones' criminal history as "troublingly violent" and the sort of man "willing to shoot over nothing." Ex. 1, at 93.

Defendant is a self-proclaimed "shot caller" in the Hoover Criminal Gang. PSR ¶ 233. He rose through the ranks from baby gangster to gangster to original gangster (O.G.). PSR ¶ 43. The ink he has on his body reaffirms his allegiance to a violent crime lifestyle. For example, he calls himself an "Everybody Killa." PSR ¶ 309. He proclaims, "God Bless the criminal who can hold his own." *Id*. "I am hated by many, loved by few, respected by all." Another tattoo says, "4 people can keep a secret, if 3 are dead." *Id*. "Hoova 74 Criminal" appears on the front of defendant's torso with a double -barreled shotgun pointing at the viewer with the barrels forming the o's in the word "Hoova." *Id*. From defendant's back, the viewer sees two semi-automatic handguns with the words "It ain't no joke."



There is nothing in defendant's history that is consistent with a law-abiding lifestyle. There is very little evidence of any productive contribution to society. Prior to his release in 2016, he had no history of gainful, verifiable employment. Throughout his life defendant has

been supported by his mother, grandmother, and a variety of girlfriends. PSR ¶¶ 302-307. Defendant's record demonstrated that since 1989, when age 16, he has been involved in persistent violent conduct and gang affiliation, punctuated by periods of imprisonment and supervision, under which defendant has failed to comply with legal restrictions. Although defendant was required to be employed under the terms of all of these releases, he has never complied throughout that period of time.

In 2008, Jones claimed he could not change his past, but he could "have a better future." Ex. 1, at 70. Defendant continued to claim he turned his life around and he wanted to help "at-risk children" and the community when he was released from custody. Ex 1, at 87. Jones' statements were only hollow words from a man hoping for a lesser sentence. Instead, Jones was released and was involved in four acts involving murder, robberies and drug trafficking within approximately 18 months.

### D.     The Need for the Sentence Imposed to Reflect the Seriousness of the Crime and Promote Respect for the Law and the Need to Provide Just Punishment for the Offense

Defendant murdered Wilbert Butler. As part of this racketeering conspiracy, he attempted and/or conspired to murder at least 10 others. He robbed people. He sold dangerous drugs. He did all of this while armed with firearms. In his gang-involved lifestyle, committing these crimes helped him achieve and maintain status. But these crimes hurt people. His crimes hurt our community. They placed people in fear of defendant and his enterprise, which is precisely the purpose of the HCG. He was rewarded on the street for these acts, but a court of law produces the opposite effect. A life sentence is a reasonable and just outcome to meet the seriousness of his offenses.

### E.  The Need to Deter Criminal Conduct

Specific and general deterrence should be important considerations here. It is very clear that defendant must be specifically deterred through incarceration. It is also important that the sentence deter the broader community from committing similar crimes by showing that a harsh penalty applies to such offenders. Defendant is a gang leader and his sentence will be seen and understood by the Hoovers, the larger gang community, and those thinking about entering gang life.

The September 2017 Butler murder was not defendant's first, nor his last, criminal endeavor with the Hoovers. Defendant was a long-term member and leader of this enterprise. He had a reputation for violence, and he led by example. He chose to join Hoovers in the 1980s and he continued to be actively involved in this enterprise for decades. Despite multiple opportunities to get off that path, both before, during and after this 2017 murder, this defendant chose to stay loyal to the Hoover Criminal Gang. That path leads to prison for life, and that alone should help deter others from similar criminal conduct.

### F.  The Need to Avoid Unwanted Sentencing Disparities

There are no defendants in this case, nor in this District, who are similarly situated to defendant Lorenzo Jones. No one has a similarly lengthy history of violent shooting offenses as a 30+ year member of the most violent street gang in Portland, Oregon. No defendant committed four acts involving murder in a seven-month period (May-December 2017), after having previously been convicted of multiple crimes involving murder. No defendant has caused such extensive injuries to multiple shooting victims, some of whom were innocent and not the intended target (e.g., Butler, L.H. and C.T.).

The mandatory sentence for VICAR is a life sentence and anyone convicted will be sentenced to a life sentence. Although this case is the only second VICAR prosecution in the District of Oregon, the two defendants in the Gypsy Joker case (3:18-cr-00319-MO) that chose to go to trial received their mandatory life sentence. The government is seeking the same sentence for Jones' codefendant, Ronald Rhodes.

Defendant had the same opportunity that every other co-conspirator had in this case to take responsibility and help put a stop to this criminal enterprise. Instead, he chose to go to trial, and a jury found him guilty beyond a reasonable doubt. He now faces the mandatory consequence of his decision–a life sentence.

### G.      The Need to Protect the Public from further Crimes of the Defendant

Supervision has never been adequate to protect the community from defendant's criminality. Most recently, during his first year and a half on federal supervision in 2016-2017, defendant committed substantial racketeering activity: armed robbery and shooting at a dispensary employee (2016), drug dealing (2016-2017), conspiracy to commit murder in Gresham (May 2017), murder of Wilbert Butler (Sept. 2017), attempted murder of D.H. (Dec. 2017) and attempted murder of J.C. (Dec. 2017).

In his prior federal case 3:07-CR-00168-MO, defendant was released from federal prison on June 30, 2005, with a condition of no gang association or affiliation. Only one day later, on July 1, 2005, he was wearing Hoover colors and in possession of a firearm while in a street dispute with another male, reported by a citizen neighbor to 911. PSR ¶ 279. Police responded and Jones fled into a house, changed clothes and re-appeared. His fellow Hoover Crips, who were present and included Corey Hudson, were so combative and non-compliant with the police that Hudson had to be subdued by bean bag deployment. Merely one month later, on August 8,

2005, defendant was involved in what was at that time the largest shootout in the history of downtown Portland. PSR ¶ 280.

In almost all of defendant's judgment orders he was required to have no further gang affiliation. *See* Ex. 1, at 95-96. Not only did he disobey those orders through continued gang activity, he committed new and more serious offenses almost every supervision period, culminating in this conviction.

Incarceration is the only way the community can be protected from this gang leader who styles himself an "Everybody Killa" and who, whenever out of custody, acted accordingly.

## V.    Conclusion

Given the nature and seriousness of the offenses, the need to deter similar conduct, the need to provide just punishment and most importantly, the need to protect our community from the crimes of this violent offender, the government recommends that this Court impose a sentence of life imprisonment and a consecutive 10-year term of imprisonment, followed by a 5-year term of supervised release, subject to the standard conditions, and a $300 fee assessment.

Dated: April 19, 2023                          Respectfully submitted,

NATALIE K. WIGHT
United States Attorney

*/s/ Leah K. Bolstad*
LEAH K. BOLSTAD, OSB #052039

*/s/Lewis S. Burkhart*
LEWIS S. BURKHART, OSB #082781
SARAH BARR, WSB #40758
Assistant United States Attorneys